IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARIA NAVARRO, | § | |
| | § | |
| *Plaintiff,* | § | SA-23-CV-00292-XR |
| | § | |
| vs. | § | |
| | § | |
| NEW LEAF HOMES, LLC,  CENTER | § | |
| POINT REALTY COMPANY, FRED | § | |
| GHAVIDEL, | § | |
| | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| HOWARD RHODER | § | |
| | § | |
| *Plaintiff,* | § | SA-23-CV-00293-XR |
| | § | |
| vs. | § | |
| | § | |
| NEW LEAF HOMES, LLC,  FRED | § | |
| GHAVIDEL, | § | |
| | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| DONALD BROWN, | § | |
| | § | |
| *Plaintiff,* | § | SA-23-CV-00477-XR |
| | § | |
| vs. | § | |
| | § | |
| NEW LEAF HOMES, LLC,  FRED | § | |
| GHAVIDEL, | § | |
| | § | |
| *Defendants.* | § | |

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
REGARDING NEW LEAF HOMES' AND PLAINTIFFS' MSJs
ON BREACH-OF-CONTRACT CLAIMS & FLSA EXEMPTION**

**To the Honorable United States District Judge Xavier Rodriguez:**

1

This Report and Recommendation concerns the following motions for summary judgment filed by Plaintiffs and Defendant NewLeaf Homes, LLC: Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#65] in Civil Action No. 5:23-cv-00292-XR; Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#51] in Civil Action No. 5:23-cv-00293-XR; Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#42] in Civil Action No. 5:23-cv-00477-XR; Plaintiff's Motion for Partial Summary Judgment [#74] in Civil Action No. 5:23-cv-00292-XR; Plaintiff's Motion for Partial Summary Judgment [#53] in Civil Action No. 5:23-cv-00293-XR; and Plaintiff's Motion for Partial Summary Judgment [#44] in Civil Action No. 5:23-cv-00477-XR.

All pretrial matters in the consolidated cases have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Plaintiffs' motions for partial summary judgment against NewLeaf be denied. It is also recommended that Defendant NewLeaf Homes, LLC's motions for summary judgment as to Plaintiffs' claims for breach of contract and a violation of the Fair Labor Standards Act ("FLSA") be denied.

## I.  Background

Plaintiffs Maria Navarro, Howard Rhoder, and Donald Brown each filed a separate cause of action in state court against their former employer, Defendant NewLeaf Homes, LLC ("NewLeaf"), a builder and residential community developer, and its owner, Fred Ghavidel. Navarro's suit also names a third defendant, Center Point Realty Company ("Center Point"). All three Plaintiffs were sales agents assigned to sell, monitor, and service new home sales in an assigned NewLeaf community subdivision. All three Plaintiffs contend that Defendants

misclassified them as independent contractors, failed to pay them earned commissions, and discriminated against them based on various protected characteristics. The claims asserted in the three lawsuits are breach of contract, quantum meruit, promissory estoppel, unjust enrichment, fraud, money had and received, theft of services, violations of the Fair Labor Standards Act ("FLSA"), willful filing of fraudulent tax forms in violation of 26 U.S.C. § 7434, violation of the Texas Payday Law, and discrimination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Texas Labor Code.

The District Court consolidated the three cases on August 9, 2024, and the undersigned issued a formal order of consolidation on April 7, 2025. There are ten motions for summary judgment pending in the three consolidated cases. Each Plaintiff has filed a motion for partial summary judgment on their breach-of-contract claims. Each Defendant has filed a motion for summary judgment in each of the three cases as to all claims. The undersigned held a status conference with the parties on April 17, 2025, to address case management post-consolidation. At the conference, the undersigned informed the parties of the intent to first address NewLeaf's three motions for summary judgment regarding all causes of action except those pertaining to alleged discrimination (due to the individualized nature of these claims) and to also consider Plaintiffs' partial motions for summary judgment on their claims of breach of contract against NewLeaf. The undersigned also entered an order after the conference specifically directing Plaintiffs to address NewLeaf's arguments for summary judgment "regarding all causes of action except for the causes of action pertaining to alleged discrimination" in their summary-judgment response. (Order [#78].)

The three Defendants (NewLeaf, Ghavidel, and Center Point) filed a consolidated response to Plaintiffs' motions for partial summary judgment [#79], to which Plaintiffs filed a

consolidated reply [#82]. Plaintiffs filed their consolidated response to NewLeaf's three motions for summary judgment [#80], to which NewLeaf filed a consolidated reply [#81]. However, despite the undersigned's directive to Plaintiffs to address all causes of action except for those pertaining to discrimination in their response, Plaintiffs only addressed NewLeaf's claims for breach of contract and violations of the FLSA. NewLeaf's reply also addressed only these two claims.

In the Fifth Circuit, the failure to pursue a claim or defense beyond the party's initial pleading may be deemed abandonment or waiver of that claim. *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived") (internal quotation and citation omitted). It is unclear if Plaintiffs are intending to abandon their claims of quantum meruit, promissory estoppel, unjust enrichment, fraud, money had and received, theft of services, willful filing of fraudulent tax forms in violation of 26 U.S.C. § 7434, and violation of the Texas Payday Law. NewLeaf addressed all these claims in its motions for summary judgment, and the undersigned ordered Plaintiffs to address all claims except for their claims of discrimination in their summary-judgment response. However, given the procedural complexity of these consolidated cases, the undersigned will ask Plaintiffs to clarify for the District Court whether they intend to abandon these claims. This report and recommendation, however, only addresses the breach-of-contract claims and FLSA exemption issues briefed by the parties in their consolidated response and reply.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995).  The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).  The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary-judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174.

### III.  Summary Judgment Record

NewLeaf is a homebuilder, residential community builder, and land developer that constructs and sells new houses within its residential communities and subdivisions.  (Orig. Pet. [#1-2], at ¶ 19; Answer [#14], at ¶ 19.)  Fred Ghavidel is the owner, president, and manager of NewLeaf.  (Orig. Pet. [#1-2], at ¶ 93; Answer [#14], at ¶ 93.)  All three Plaintiffs worked as sales agents for NewLeaf for a period of years until March and April 2021, when they were laid off, along with two other sales agents who are not involved in this litigation.  (Orig. Pet. [#1-2], at ¶ 21; Answer [#14], at ¶ 21; Rhoder Decl. [#53-17],[1] at ¶ 2; Brown Decl. [#44-17],[2] at ¶ 2.) NewLeaf has consistently taken the position that the reason for the layoffs was  a change in the market from the COVID-19 pandemic and a need for a reduction in force.  (NewLeaf Corp. Rep. Dep. [#65-8], at 150:6–151:3.)   After Plaintiffs were laid off, they each received severance payments although they were not required to execute releases.  (Navarro Checks [#65-11], at 6–8; Rhoder Checks [#81-5], at 5–7; Brown Checks [#81-5], at 9–12.)

It is undisputed that there are a significant number of real estate transactions for which Plaintiffs never received commissions because the transaction closed after their termination. Defendants created and produced a spreadsheet in discovery, identifying "yellow" properties where each Plaintiff procured the buyer and executed the purchase agreement and the same buyer ultimately closed on the property.  (NewLeaf Spreadsheet Navarro [#79-16], at 1–9; NewLeaf Spreadsheet Rhoder [#79-17], at 1–13; NewLeaf Spreadsheet Brown [#79-18], at 2–13; *see also* Rhoder Decl. [#53-17],[3] at ¶ 5; Rhoder List of Unpaid Commissions [#53-1],[4] at 1;

---

[1] This exhibit is found in Case No. 5:23-cv-00293-XR.

[2] This exhibit is found in Case No. 5:23-cv-00477-XR.

[3] This exhibit is found in Case No. 5:23-cv-00293-XR.

Brown Decl. [#44-17],[5] at ¶ 6; Brown List of Unpaid Commissions [#44-1],[6] at 1; Navarro List of Unpaid Commissions [#74-1], at 1.)  Plaintiffs also assert that there are properties for which they were paid a commission but the commission was underpaid.  (Rhoder Underpaid Commissions [#53-2],[7] at 1; Brown Underpaid Commissions [#44-18],[8] at 1–4; Navarro Underpaid Commissions [#74-2], at 1.)  The parties executed several agreements during their employment relationship, and these agreements bear on whether NewLeaf lawfully withheld the commissions Plaintiffs claim they earned.

All three Plaintiffs signed an Independent Contractor Agreement with NewLeaf in late 2016 or early 2017.  (Navarro NewLeaf IC Agreement [#65-1], at 1–5; Rhoder NewLeaf IC Agreement [#81-2], at 7–11; Brown NewLeaf IC Agreement [#81-2], at 13–17.)  The NewLeaf Independent Contractor Agreement provides that as a salesperson for NewLeaf, Plaintiffs are employed to "sell, monitor and service each new home sale through closing" and that these responsibilities were to cover the assigned model homes in NewLeaf developments and subdivisions from 12 p.m. to 6 p.m. every day, for seven days a week.  (Navarro NewLeaf IC Agreement [#65-1], at 1; Rhoder NewLeaf IC Agreement [#81-2], at 7; Brown NewLeaf IC Agreement [#81-2], at 13.)[9]  In return, New Leaf agreed to pay Plaintiffs a commission based on the "base sales price" of the home: 2.75% if the purchaser did not have a representative agent

---

[4] This exhibit is found in Case No. 5:23-cv-00293-XR.

[5] This exhibit is found in Case No. 5:23-cv-00477-XR.

[6] This exhibit is found in Case No. 5:23-cv-00477-XR.
[7] This exhibit is found in Case No. 5:23-cv-00293-XR.

[8] This exhibit is found in Case No. 5:23-cv-00477-XR.

[9] The agreements are identical.  The undersigned therefore only refers to Navarro's agreement throughout the remainder of this recommendation.

and 1.25% if the purchaser did have an agent.  (Navarro NewLeaf IC Agreement [#65-1], at 2.)

Plaintiffs did not receive any hourly wages for the work they performed or other compensation

aside from their earned commissions.  (NewLeaf Corp. Rep. Dep. [#65-8], at 156:18–21.)

The Agreement set forth certain criteria that must be accomplished regarding each sale to

entitle the sales agent to an earned commission:

> (a) [T]he sale must be initiated by the Salesperson or salesperson's partner when working in multi-salesperson communities in which commissions are shared.
>
> (b) A contract between NewLeaf and the purchaser(s) must be obtained and the purchase agreement form must be ratified by an authorized officer of NewLeaf Homes.
>
> (c) An earnest money deposit in an amount and form acceptable to NewLeaf Homes must be obtained at the time the purchase agreement is executed by the purchaser(s).
>
> (d) The salesperson must conduct all required communications with the: purchaser(s), construction department, lender, realtor(s), NewLeaf Homes personnel, and any other applicable person and/or entity in an appropriate and effective manner so as to coordinate the efforts of all in accomplishing a timely and successful closing on the sale.
>
> (e) The salesperson must assist in ensuring completion of all required contract documentation.
>
> (f) The actions and conduct of the salesperson must be consistent with the policies and procedures of NewLeaf Homes.

(Navarro NewLeaf IC Agreement [#65-1], at 2.)  The Agreement reiterates that "if any of the

foregoing criteria are not met, the sales commission will not be earned, and the Salesperson will

receive no commission for sales which do not meet the foregoing criteria."  (*Id.* at 3.)  The

Agreement further provides that "[t]he timing, frequency and manner of payment of such

compensation shall be in accordance with the Company's regular payroll practices."  (*Id.*)

Commissions were always paid upon closing.  (NewLeaf Corp. Rep. Dep. [#65-8], at 125:11–14.)

Additionally, the Agreement states that "[a]ll payments by [NewLeaf] shall be subject to change at the discretion of the company[,]" and that NewLeaf "reserves the right to amend, modify, and change or terminate its polices with regard to payment of commissions, in whole or in part."  (Navarro NewLeaf IC Agreement [#65-1], at 3.)  It also provides that "[s]uch amendments or modifications shall be effective if set forth in writing, signed by the President of NewLeaf Homes, and distributed to Sales" and that "[n]o such amendments or modifications shall apply to any homes for which the purchase contract was signed by the buyer prior to the effective date of the modification or amendment."  (*Id.*)

Nonetheless, NewLeaf reduced the commission percentage to 2% at some point during Plaintiffs' employment relationship based on an oral agreement.  (Navarro Dep. [#65-5], at 43:1–44:13; Rhoder Dep. [#65-6], at 66:22–67:3; Brown Dep. [#65-4], at 43:1–44:13; Ghavidel Dep. [#65-7], at 157:7–20; Pay Scale Model [#53-4],[10] at 2.)  Ghavidel testified that the rate was reduced to 1% prior to Plaintiffs' termination "around COVID or right before COVID time" and acknowledged that he was unable to find any documentation of this change in writing.  (Ghavidel Dep. [#65-7], at 45:25–46:10, 157:14–20.)  Plaintiffs testified that the rate was 2% at the time of their termination.  (Navarro Dep. [#65-5], at 43:1–44:13; Rhoder Dep. [#65-6], at 66:22–67:3; Brown Dep. [#65-4], at 43:1–44:13.)

The Independent Contractor Agreement defines the parties' employment as "at will" and provides that Plaintiffs' employment "may be terminated by the Salesperson or NewLeaf Homes

---

[10] This exhibit is found in Case No. 5:23-cv-00293-XR.

at any time, with or without cause." (Navarro NewLeaf IC Agreement [#65-1], at 1.) The Agreement also contains a clause entitled "Separation of Employment," which provides:

> If salesperson is terminated or leaves his or her relationship with NewLeaf Homes, the Company has the right to withhold all unpaid Commissions. Cause shall mean but not limited to: (a) any fact of fraud, intentional misrepresentation embezzlement or misappropriation or conversion of the assets or business opportunities of the Company, (b) conviction of the Employee of a felony, or (c) the Employee's willful refusal to substantially perform assigned duties.

(*Id.* at 3.) NewLeaf has not asserted that Plaintiffs were terminated for any of these three enumerated causes. All three Plaintiffs allege that NewLeaf breached the Independent Contractor Agreement by failing to pay them their earned commissions under the governing contract.

Navarro and Rhoder also signed an Independent Contractor Agreement with Center Point Realty in April 2017, a real estate company founded and managed by Ghavidel to bring sales activity "in house." (Ghavidel Dep. [#65-7], at 10:15–21, 29:3–9; NewLeaf Corp. Rep. Dep. [#65-8], at 52:21–25; Ghavidel Dep. [#65-9], at 50:3–10.) The Center Point Independent Contractor Agreement requires all licensed real estate agents working for NewLeaf to have their license with Center Point Realty. (Navarro Center Point IC Agreement [#65-2], at 1–2; Rhoder Center Point IC Agreement [#79-2], at 3–4.) Brown did not have a real estate license, and therefore did not sign an agreement with Center Point. (Brown Dep. [#65-4], at 43:16–44:16.)

As a broker with Center Point, Navarro and Rhoder could sell homes outside of NewLeaf developments and subdivisions. (Navarro Dep. [#65-5], at 7:25–13; NewLeaf Corp. Rep. Dep. [#65-8], at 73:4–76:18.) Plaintiffs' supervisor in both roles was Ghavidel, but the two companies were separate and distinct entities. (Navarro Dep. [#65-5], at 7:25–13; NewLeaf Corp. Rep. Dep. [#65-8], at 52:21–53:2, 116:16–20.) According to Ghavidel, when there was a

NewLeaf sale, NewLeaf would pay Center Point and then Center Point would distribute the funds, including commissions. (Ghavidel Dep. [#65-10], at 70:5–13.)

The Center Point Agreement entitles agents to receive 100% of the commissions on sales involving NewLeaf Homes buyers, minus a $199 transaction fee, and 80% of the commissions for sales not involving NewLeaf Homes buyers or outside of NewLeaf Homes, subject to certain listing limitations per calendar year. (Navarro Center Point IC Agreement [#65-2], at 1; Rhoder Center Point IC Agreement [#79-2], at 3.) Accordingly, the Agreement clarifies that for sales outside of NewLeaf developments, Navarro and Rhoder were entitled to a lesser percentage of earned commissions. The Center Point Agreement also contains a termination provision, which provides the following:

> If an agent is terminated or leaves his or her relationship with Center Point Realty. Company has the right to withhold all unpaid commission. It will be at the discretion of Center [P]oint on any outside listings at the time of his or her leaving.

(Navarro Center Point IC Agreement [#65-2], at 1; Rhoder Center Point IC Agreement [#79-2], at 3.) Navarro, but not the other two Plaintiffs, alleges that Center Point breached this agreement by underpaying commissions earned and paid prior to her termination.

## IV. Analysis

Plaintiffs and NewLeaf have filed cross motions for summary judgment on Plaintiffs' claims of breach of contract. NewLeaf also seeks summary judgment on Plaintiffs' claims under the FLSA. Plaintiffs' and NewLeaf's motions should be denied. Plaintiffs have not established as a matter of law that they completed all required performance under the contract or that the procuring-cause doctrine applies to require the payment of the challenged commissions. Plaintiffs are therefore not entitled to summary judgment on their claims for breach of contract. NewLeaf has not established as a matter of law that it did not breach the contracts at issue.

11

NewLeaf therefore is also not entitled to summary judgment on Plaintiffs' claim for breach of contract. NewLeaf is also not entitled to summary judgment on Plaintiffs' FLSA claims because NewLeaf has not established as a matter of law that it is entitled to its affirmative defense of the outside sales exemption to the FLSA's requirements as to minimum wage and overtime compensation.

**A.    Cross Motions for Summary Judgment on Breach of Contract**

Plaintiffs and NewLeaf seek summary judgment on the breach-of-contract claims asserted by all three Plaintiffs. Plaintiffs contend that they fully performed their obligations under the NewLeaf Independent Contractor Agreement, and NewLeaf breached the Agreement by failing to pay Plaintiffs their earned commissions pursuant to the contract. (Orig. Pet. [#1-2], at ¶¶ 134–41.) NewLeaf argues it was entitled to withhold commissions after Plaintiffs' termination under the parties' agreement.[11]

The parties agree that Texas law governs Plaintiffs' breach-of-contract claims. To prevail on a breach-of-contract claim under Texas law, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant, (2) the plaintiff tendered performance or was excused from doing so, (3) the defendant breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the defendant's breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

The parties also agree that there is a valid and binding contract governing their employment relationship yet dispute whether Plaintiffs tendered all performance required to entitle them to the withheld commissions. The parties also disagree as to whether a breach

---

[11] Navarro has also moved for summary judgment on her breach-of-contract claim against Center Point, but the undersigned will address that in a future Report & Recommendation when it addresses Center Point's motion for summary judgment.

occurred when New Leaf failed to pay Plaintiffs commissions after their termination. "A breach occurs when a party fails or refuses to perform an act that it has expressly promised to perform." *Note Inv. Grp., Inc. v. Assocs. First Cap. Corp.*, 83 F. Supp. 3d 707, 728 (E.D. Tex. 2015). "When a promise is subject to a condition precedent, however, there can be no breach of contract until such condition or contingency is performed or occurs." *Id.* Resolving the parties' dispute requires the Court to construe the governing contract, the NewLeaf Independent Contractor Agreement.[12]

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument and to ensure contract terms are construed according to "the ordinary, everyday meaning of the words to the general public." *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019) (quoting *Progressive Cnty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003)). The most important consideration in interpreting the meaning of a contract is "the agreement's plain, grammatical language." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). To that end, the terms used in the contract are given their plain, ordinary meaning unless the contract itself shows that the parties intended the terms to have a different, technical meaning. *Exxon Mobil Corp.*, 568 S.W.3d at 657. Context is important, and this Court must examine the entire writing and

---

[12] Insofar as NewLeaf is taking the position that the Center Point Independent Contractor Agreement's provision regarding termination of employment controls the payment of commissions on NewLeaf sales, there is insufficient evidence before the Court to support this argument. It is undisputed that NewLeaf and Center Point are two distinct entities, although Center Point distributed commission payments, even on NewLeaf sales. (Navarro Dep. [#65-5], at 7:25–13; NewLeaf Corp. Rep. Dep. [#65-8], at 52:21–53:2, 116:16–20; Ghavidel Dep. [#65-10], at 70:5–13.) Center Point's agreement could not govern NewLeaf sales, as not all NewLeaf salespersons signed the Center Point agreement. Brown did not have a real estate license, and therefore did not sign an agreement with Center Point. (Brown Dep. [#65-4], at 43:16–44:16.) The relevant contract for Plaintiffs' claims of breach of contract regarding NewLeaf sales commissions is the NewLeaf Independent Contractor Agreement.

endeavor to harmonize and give effect to all the provisions so that no provision of the contract is rendered superfluous or meaningless. *Id.*

If a contract is worded so that it can be given a certain or definite meaning or interpretation, it is not ambiguous, and a court should construe the contract as a matter of law. *See United States v. Fid. & Deposit Co.*, 10 F.3d 1150, 1152 (5th Cir. 1994). *See also Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (mandating that unambiguous provisions appearing in a contract must be given the plain meaning of their terms); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) (noting that absent ambiguity, "the construction of the written instrument is a question of law for the Court"). A fact issue arises as to the proper interpretation of a written contract only if the contract is ambiguous. *In re Fender*, 12 F.3d 480, 485 (5th Cir. 1994). An agreement, however, is not ambiguous merely because the parties disagree upon its correct interpretation; rather, it is ambiguous only if both interpretations are reasonable. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992). A court cannot look to extrinsic evidence outside of the contract to create an ambiguity. *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006). *See also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). "It is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used." *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990).

**i.     Plaintiffs have not established as a matter of law that they tendered complete performance under the contract.**

For Plaintiffs to prevail on their motions for partial summary judgment, they must prove every element of their breach-of-contract cause of actions against NewLeaf, which requires that they first establish as a matter of law that they completed all performance required to earn the commissions they seek.  According to the contract, to earn commissions on NewLeaf sales, Plaintiffs must satisfy the following criteria: (a) they or their partner must initiate the sale; (2) a contract must be obtained and ratified by a NewLeaf officer; (c) an earnest money deposit must be obtained upon execution of the contract; (d) they must conduct all required communications; (e) they must assist in ensuring completion of all required contract documentation; and (f) the actions and conduct of the salesperson must be consistent with the policies and procedures of NewLeaf.  (Navarro NewLeaf IC Agreement [#65-1], at 2.)

It is undisputed that Plaintiffs initiated sales, obtained buyers, facilitated the execution of contracts, and obtained earnest money deposits for real estate transactions that ultimately closed and for which they did not receive commissions.  (NewLeaf Corp. Rep. Dep. [#65-8], at 111:17–112:2; Navarro Decl. [#84-17], at ¶¶ 3–8; Purchase Agreements (Navarro) [#84-10, #84-11, #84-12]; Rhoder Decl. [#53-17],[13] at ¶¶ 3–4); Purchase Agreement (Rhoder) [#53-7],[14] at 2–12; Brown Decl. [#44-17],[15] at ¶ 3); Purchase Agreement (Brown) [#44-6],[16] at 2–26.)  Plaintiffs have not established as a matter of law, however, that they completed all other requirements set

---

[13] This exhibit is found in Case No. 5:23-cv-00293-XR.

[14] This exhibit is found in Case No. 5:23-cv-00293-XR.

[15] This exhibit is found in Case No. 5:23-cv-00477-XR.

[16] This exhibit is found in Case No. 5:23-cv-00477-XR.

forth in the contract. Particularly, subsections (d) and (e) of the section entitled "Criteria for Salespersons to Earn Commissions" provide:

> (d) The salesperson must conduct all required communications with the: purchaser(s), construction department, lender, realtor(s), NewLeaf Homes personnel, and any other applicable person and/or entity in an appropriate and effective manner so as to coordinate the efforts of all in accomplishing a timely and successful closing on the sale.
>
> (e) The salesperson must assist in ensuring completion of all required contract documentation.

(Navarro NewLeaf IC Agreement [#65-1], at 2.)

The contract does not define what "required communications" are necessary "to coordinate the efforts of all in accomplishing a timely and successful closing on the sale." Nor does the contract define what "contract documentation" is "required" to ensure completion of a sale. NewLeaf argues that Plaintiffs could not complete all required communications to coordinate the efforts of all in "accomplishing a timely and successful closing" if they were not employed at the time of closing. The contract suggests that NewLeaf salespersons are expected to support the real estate transaction towards closing. (*See* Navarro NewLeaf IC Agreement [#65-1], at 1 (stating that salespersons are employed to "sell, monitor and service each new home sale through closing"). Yet, the contract does not impose any clear obligation on Plaintiffs to be employed or involved in the closing itself to earn commissions on sales. Ghavidel testified in NewLeaf's corporate representative deposition that there is not any written contract, training manual, or other document clarifying company policies regarding these required communications or what precisely needs to happen to accomplish a timely closing. (NewLeaf Corp. Rep. Dep. [#67-8], at 123:18–124:3, 157:10–14.)

Based on these ambiguities in the contract, the undersigned finds that the NewLeaf Independent Contractor Agreement cannot be given a certain or definite meaning or

interpretation, such that it can be construed as a matter of law.  *See Fid. & Deposit Co*., 10 F.3d at 1152.  Both the parties' positions as to the interpretation of this provision of the contract are reasonable, and the undersigned cannot interpret the contract as a matter of law without looking outside of the contract to determine the extent of Plaintiffs' responsibilities following the execution of a real estate contract up to and through the closing of the transaction.

Once a court determines that a contract is ambiguous, it may consider parol evidence regarding the meaning of the contract's terms.  *Coker*, 650 S.W.2d at 393–94.  According to Navarro, her only responsibilities for each transaction, including those that closed and funded after her termination, involved (1) initiating contact with the buyer, (2) preparing and executing the purchase agreement, (3) securing the earnest money deposit, (4) assisting with initial communications between the  buyer and NewLeaf staff; (5) assisting in ensuring completion of required documents, and (6) assisting in facilitating selection by the buyer with the selection center.  (Navarro Decl. [#84-17], at ¶ 10.)  Plaintiffs state in their declarations that they were not responsible for conducting the closing of any of the contracts they secured and were not involved with handling funds or coordinating with the title company.  (Rhoder Decl. [#53-17], at ¶ 7; Brown Decl. [#44-17], at ¶ 5; Navarro Decl. [#84-17], at ¶ 11.)  Plaintiffs further state that, after the contract stage, the transaction was handled by other NewLeaf personnel, namely the closing coordinator.  (Rhoder Decl. [#53-17], at ¶ 7; Brown Decl. [#44-17], at ¶ 5.)  Navarro's declaration also asserts that she was paid commissions on many properties that she sold during her employment after completing the same work she did for properties closing after her termination for which she has not received commissions.  (Navarro Decl. [#84-17], at ¶ 9.)

Ghavidel consistently testified in NewLeaf's corporate representative deposition that the closing coordinator would handle contracts from the beginning to the end, would serve as the

liaison between sales and the lender, and would manage all parts of the closing transaction. (Rhoder Decl. [#53-17], at ¶ 7; Brown Decl. [#44-17], at ¶ 5; NewLeaf Corp. Rep. Dep. [#67-8], at 86:10–87:1.)  However, Ghavidel also testified that there were numerous communications and tasks required of NewLeaf's salespersons after the signing of a contract, including scheduling a buyer's walk through with the construction department on any spec houses, addressing any post-closing items, making sure the lender had any necessary documents, and coordinating the closing with the closing coordinator.  (NewLeaf Corp. Rep. Dep. [#67-8], at 136:12–17.)  Per Ghavidel, these were not predetermined communications or conversations, but involved the expectation of the salesperson being available to the buyer at any time to answer any miscellaneous question that might come up regarding when a spec house might be ready for move-in, whether the buyer was still going to qualify for the loan, and whether the lender was ready to close.  (Ghavidel Dep. [#67-9], at 126:14–127:12.)

Based on the foregoing, a fact issue remains as to the parties' intent in premising the earning of commissions on "conduct[ing] all required communications . . . so as to coordinate the efforts of all in accomplishing a timely and successful closing on the sale" and "ensuring completion of all required contract documentation."  (Navarro NewLeaf IC Agreement [#65-1], at 2.)  A fact issue also remains as to whether Plaintiffs tendered complete performance under the contract.  Where the parties dispute whether they have performed the conduct required under an agreement, the court must submit that factual dispute to the jury.  *See X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413–14 (5th Cir. 2013).  Because Plaintiffs have not established as a matter of law that they tendered complete performance under the contract, they cannot prevail on their claims of breach of contract.

ii.     **Plaintiffs have not established that the procuring-cause doctrine entitles them to the challenged commissions.**

Plaintiffs make an additional and alternative argument in their summary-judgment motions for the Court to consider if it concludes that Plaintiffs have not proved as a matter of law that they satisfied all contractual obligations to entitle them to the challenged commissions. Plaintiffs contend that they are entitled to recover the commissions pursuant to the procuring-cause doctrine.

Texas recognizes the "procuring-cause doctrine," which imposes a default rule crediting a broker or salesperson "for a commission-generating sale" when a purchaser is produced through the broker's efforts, "ready, able and willing to buy the property upon the contract terms." *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, 645 S.W.3d 228, 234 (Tex. 2022). "Under this doctrine, the broker's entitlement to a commission vests on his having procured the sale, not on his actual involvement in a sale's execution or continued employment through the final consummation of the sale." *Id.* at 234–35.

Three questions dictate the application of the procuring-cause doctrine:

> First, did the parties have the kind of contractual relationship to which the procuring-cause doctrine applies? If so, did the parties displace the doctrine by the terms of their contractual agreement? Finally, if the procuring-cause doctrine applies to the parties' dispute and was not displaced, to what extent does the doctrine impose liability for the specific commission payments that the plaintiff demands?

*Id.* at 234. "Texas strongly favors parties' freedom of contract." *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021) (internal quotation and citation omitted). "When a seller agrees to pay sales commissions to a broker (or other agent), the parties are free to condition the obligation to pay commissions however they like." *Perthuis*, 645 S.W.3d at 231.

> The contract could deny the payment of commissions from procured sales absent continued employment; authorize commissions only on sales that

> close during the employment or brokerage relationship; condition commissions on the money from the sale being received within a particular time frame; provide a time limit after termination beyond which commissions from procured sales will not be paid; or include a myriad of other terms that could displace the procuring-cause doctrine in whole or in part.

*Id.* at 237. "The doctrine provides nothing more than a default, which applies only when a valid agreement to pay a commission does not address questions like how a commission is realized or whether the right to a commission extends to sales closed after the brokerage relationship ends." *Id.* at 234.

Because the Independent Contract Agreement provides that Plaintiffs' only compensation for their work for NewLeaf was the payment of commissions based on the sales price of homes, the parties had the kind of contractual relationship implicating the doctrine. *See id.* at 239. The question is therefore whether the parties displaced the procuring-cause doctrine with express contractual terms regarding commission payments. In *Perthuis*, the contract was silent about any exceptions to the duty to pay commissions; the contract merely provided that employment was "at will" and the "commission [was] 3.5% of [the broker's] net sales." *Id.* In finding that the procuring-cause doctrine was not displaced, the Supreme Court of Texas determined that the at-will provision did not affect the broker's compensation, and the only provision addressing commissions "simply established a generic commission-based compensation structure." *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. Sbc, L.L.C.*, 93 F.4th 870, 876 (5th Cir. 2024) (discussing *Perthuis*, 645 S.W.3d at 239).

In determining whether Texas's default rule applies, the Fifth Circuit has emphasized that it is the "[c]ontractual silence" observed in *Perthuis* that is what "leaves the procuring-cause doctrine intact." *Id.* The contract the Fifth Circuit considered in *Catalyst Strategic Advisors* was not silent as to the handling of post-termination commissions. *Id.* Rather, it contained "a robust

20

accounting of Catalyst's fees, including provisions for interim fees, various gradations of completion fees, and the conditions under which those fees might be earned[,]" as well as "terms for whether Catalyst could collect an Advisory Completion Fee after the contract was terminated." *Id.* For the Fifth Circuit in *Catalyst Strategic Advisors*, what mattered was that "the parties clearly spoke" on various aspects of the earning and payment of commissions, including how to handle post-termination payments, even if the various contractual provisions they agreed to were "subject to interpretation." *See id.*

Similarly, here, the contract both imposes specific criteria the salesperson must satisfy to earn commissions and includes a specific contractual provision entitled "Separation of Employment," addressing the effect of separation of employment on the payment of commissions. (Navarro NewLeaf IC Agreement [#65-1], at 2–3.) Under the Fifth Circuit's reasoning, even if there are ambiguities in the meaning of these contractual provisions, there is no ambiguity as to the parties intent to depart from and displace the default procuring-clause doctrine by including these additional contractual terms. *Catalyst Strategic Advisors*, 93 F.4th at 876 ("While the precise meaning of the Engagement Letter may be subject to interpretation, the parties clearly spoke on these issues—far from the '[c]ontractual silence' that the Supreme Court of Texas encountered in *Perthuis*."); *see also Perthuis*, 645 S.W.3d at 239–40 (acknowledging that "*if* there were an insoluble ambiguity about the commission obligation, it would present a fact question for a jury") (emphasis in original). While this Court must still interpret the meaning of NewLeaf's contractual provisions regarding the payment of commission in addressing the parties' motions for summary judgment, the undersigned finds that these provisions evince an intent to displace the procuring-cause doctrine, and this default rule does not entitle Plaintiffs to the challenged commissions as a matter of law. *See id.* Plaintiffs are

therefore not entitled to summary judgment on their breach-of-contract claims on this alternative basis.

### iii. __NewLeaf is not entitled to summary judgment on Plaintiffs' breach-of-contract claims either.__

Now the undersigned turns to the question of whether NewLeaf is entitled to summary judgment on Plaintiffs' breach-of-contract claim based on its assertion that there is no genuine dispute as to its breach of the parties' agreements. NewLeaf contends that the contract expressly provides that commissions can be withheld upon termination of the employment relationship and that commissions were not earned until closing.

The undersigned has already found a genuine dispute of material fact as to whether Plaintiffs satisfied all required criteria set forth in the NewLeaf Independent Contract Agreement to earn the commissions at issue. However, if NewLeaf can establish that the contract unambiguously permits the withholding of commissions after Plaintiffs' termination regardless of the circumstances of their termination, then whether Plaintiffs earned or did not earn the commissions is immaterial to the alleged breach of the contract based on the withholding of commissions following Plaintiffs' termination.

Again, the NewLeaf Independent Contractor Agreement states the following regarding termination of the employment relationship in a section of the contract entitled "Separation of Employment":

> If salesperson is terminated or leaves his or her relationship with NewLeaf Homes, the Company has the right to withhold all unpaid Commissions. Cause shall mean but not limited to: (a) any fact of fraud, intentional misrepresentation embezzlement or misappropriation or conversion of the assets or business opportunities of the Company, (b) conviction of the Employee of a felony, or (c) the Employee's willful refusal to substantially perform assigned duties.

(Navarro NewLeaf IC Agreement [#65-1], at 3.)   NewLeaf asks the Court to construe this provision as providing unfettered discretion to NewLeaf to withhold commissions after termination regardless of the reason for the termination.   Applying governing canons of contract construction, the undersigned declines to adopt NewLeaf's interpretation as a matter of law.

Again, this Court must examine an entire writing and endeavor to harmonize and give effect to all its provisions so that no part of the contract is rendered superfluous or meaningless. *Exxon Mobil Corp.*, 568 S.W.3d at 657.   There are only two sentences in the "Separation of Employment" section of the NewLeaf contract.   The first sentence states that NewLeaf "has the right to withhold all unpaid Commissions" if a salesperson is terminated or voluntarily separates his or her employment.   (NewLeaf IC Agreement [#65-1], at 3.)   The second sentence of the provision defines "cause" and states that cause means "but is not limited to" three bad acts that might be taken by the employee.   (*Id.*)   Although the first sentence regarding the withholding of commissions does not reference the word "cause" at all, the Court declines to read the "cause" definition as completely irrelevant to the effect of separation of employment on the right to receive commissions after termination.   (*See id.*)

The "scope-of-subparts" canon of contract construction stands for the principle that material within an indented subpart of a contract relates only to that subpart, whereas material contained in an un-indented portion of text relates to all the following or preceding indented subparts. *Matter of Pirani*, 824 F.3d 483, 495 (5th Cir. 2016) (citing Antonin Scalia and Bryan A. Garner, Reading Law 156 (2012)).   Although this is a canon of contract construction that arose in the federal common law, Texas courts have cited and embraced the rule, emphasizing the significance of the structural context in which a specific contractual provision is found.   *See*

*Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 634 (Tex. 2018) (citing Scalia and Garner for the following: "[m]aterial within an indented subpart relates only to that subpart.").

 The term "cause" only appears in one other section of the contract, the section addressing the parties' at-will employment relationship. (NewLeaf IC Agreement [#65-1], at 1 ("Salesperson understands and acknowledges that his or her relationship with NewLeaf Homes is 'at will' and may be terminated by [either party] at any time, with or without cause.").) Yet, the *definition* of "cause" is only included once in the contract—in the "Separation of Employment" section. (*Id.* at 3.) This section of the contract addresses only one thing—the effect of separation of employment on the receipt of commissions. (*Id.*) To harmonize the contract and give effect to all provisions, the Court must give some significance to NewLeaf's decision to include a definition of "cause" *only* in the section of the contract addressing the withholding of commissions following termination. Any other reading would render the entire "for cause" definition inoperative. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) (courts must strive to give meaning to every clause of contract "to avoid rendering any portion inoperative").

 This reading is supported by the contrasting language in the termination provision drafted by Center Point Realty, which does not include any restrictive language regarding termination for cause. (Center Point IC Agreement [#67-2], at 1.) "While extrinsic evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists." *Autobond Acceptance Corp. v. Progressive N. Ins. Co.*, 76 S.W.3d 489, 493 (Tex. App.—Houston [14th Dist.] 2002); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Ghavidel, as the owner and director of both NewLeaf and Center Point, could have used the

same language in the NewLeaf Independent Contractor Agreement regarding the effect of termination on the receipt of earned commissions but chose not to do so. This fact is further support for the conclusion that the Court should not read the for-cause definition out of the contract completely and give it no effect whatsoever.

What then is the relationship between the reference to for-cause termination and the discretion the contract confers on NewLeaf to withhold commissions? NewLeaf argues that the fact the "cause" definition provides three examples of cause yet also clearly states cause is "not limited to" those three definitions means it can withhold commissions based on any unlisted reason for termination, including its business decision to downsize its sales force. Although the contract does not state that a separation "for cause" involves the commission of some sort of misconduct, all three examples of separation "for cause" in the contract involve significant bad acts: fraud or embezzlement, a felony conviction, or the willful refusal to perform assigned duties. (NewLeaf IC Agreement [#65-1], at 3.) Moreover, the plain meaning of termination "for cause" in the employment context is termination due to an employee's negative actions or behaviors. NewLeaf's attempt to read "without cause" into the "Separation of Employment" provision is not reasonable, especially considering the express reference to both "with or without cause" in the section of the contract governing the parties' at-will relationship. (NewLeaf IC Agreement [#65-1], at 1.) That NewLeaf included a reference to "cause" and not "without cause" in the section of the contract addressing the effect of termination on the receipt of commissions supports Plaintiffs' reading of the contract as limiting the right to withhold commissions only to terminations for misconduct, including but not limited to the examples provided in the contract. NewLeaf is not asserting that Plaintiffs were terminated for cause, only

that the terminations were for business reasons due to the economic downturn and the COVID-19 pandemic.

In summary, the contract is not clear as to the relationship between the "cause" definition included in the "Separation of Employment" provision of the contract and the ability to withhold commissions. As the contract cannot be given "a definite or certain legal meaning," it is ambiguous. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). "It is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used." *Gonzalez*, 795 S.W.2d at 737. NewLeaf is not entitled to summary judgment because it has not established as a matter of law that it did not breach the contract by withholding commissions from Plaintiffs after their termination.

**B.    NewLeaf's Motion for Summary Judgment on FLSA Claims**

NewLeaf also moves for summary judgment on Plaintiffs' claims under the FLSA. The FLSA requires employers to pay their employees a minimum wage and overtime compensation. 29 U.S.C. §§ 206(a)(1), 207(a). All three Plaintiffs allege that NewLeaf violated the FLSA by failing to pay them the federally mandated minimum wage and overtime compensation for all hours worked over 40 in a given workweek. (*See, e.g.*, Navarro Orig. Pet. [#1-2], at ¶¶ 202–216.) The FLSA applies only to covered employees, not to independent contractors. *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 362 (5th Cir. 2023) (citing 29 U.S.C. § 207). Additionally, Congress has recognized "that a minimum wage and overtime pay would be impractical or inappropriate for some jobs." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 48 (2025). Therefore, the FLSA exempts many categories of employees from the FLSA's overtime-pay requirement. *Id.* One such exemption is the outside-salesperson exemption. 29 U.S.C. § 213(a)(1).

26

NewLeaf's responsive pleadings assert that Plaintiffs were never its employees but rather commissioned exempt outsides-sales agents. (*See, e.g.*, Answer [#14], at ¶¶ 74–75.)

NewLeaf has moved for summary judgment on Plaintiffs' FLSA claims based on the outside-sales exemption. Although NewLeaf contends that Plaintiffs were independent contractors, not NewLeaf employees subject to the FLSA's mandate, it did not move for summary judgment on this basis. Plaintiffs nonetheless briefed this issue in their response to NewLeaf's summary-judgment motion. The undersigned therefore only considers herein the argument of NewLeaf in its motion—that even if Plaintiffs were employees, not independent contractors, their FLSA claims fail because they are exempt under the outside-salesperson exemption.

FLSA exemptions are an affirmative defense, for which NewLeaf bears the burden of proof. *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 580–81 (5th Cir. 2013). The employer must prove facts by a preponderance of the evidence that show the exemption is "plainly and unmistakably" applicable. *Id.* Because NewLeaf has not carried this burden, it is not entitled to summary judgment on Plaintiffs' FLSA claims based on its affirmative defense. A factfinder will decide at trial both whether Plaintiffs were employees of NewLeaf and whether the exemption applies.

FLSA exemptions are to be fairly, and not narrowly, construed. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018). The outside-salesperson exemption exempts workers "employed . . . in the capacity of outside salesman (as such term [is] defined and delimited from time to time by the regulations of the Secretary . . . "). 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") defines the term "employee employed in the capacity of outside salesman" as any employee:

(1) Whose primary duty is (i) making sales within the meaning of section [203(k) of the FLSA], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(1)–(2). As to primary duty, the regulations define the term as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). Section 203(k), in turn, states that "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). Thus, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 148 (2012).

There are therefore two components of the outside-salesperson exemption: (1) the primary-duty requirement; and (2) the requirement that the performance of the primary duty be "customarily and regularly" *outside* the employer's place of business. 29 C.F.R. § 541.500(a)(1)–(2). Plaintiffs do not dispute that their primary duty involved making sales. (*See* Pls.' Resp. [#80], at 16.) They maintain, however, that they were not customarily and regularly engaged outside of the employer's place or places of business in performing their primary duty.

Plaintiffs assert that NewLeaf fails to address the second prong of the outside-salesperson exemption in its motions for summary judgment and has not identified any record evidence to support the "outside" part of the exemption. In its reply, NewLeaf asserts that Plaintiffs did not work at its offices but had temporary offices in the model homes where they marketed sales in the various subdivisions that NewLeaf was developing. (Reply [#81], at 8–9.) NewLeaf also claims that the office work Plaintiffs completed was in pursuit of developing and/or coordinating

sales. (*Id.* at 10.) But NewLeaf does not direct the Court to any evidence from the summary-judgment record on either of these points. *Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir. 1996) ("unsubstantiated assertions are not competent summary judgment evidence"). It is not this Court's responsibility to cull through the over one thousand pages of deposition testimony to attempt to find testimony to support NewLeaf's assertions in its briefing.

Nonetheless, the undersigned notes that "[r]eal estate salespeople generally meet the test" as exempt outside salespersons. *See Benson v. United InvestexUSA 10, LLC*, No. 3:19-CV-01161-E, 2021 WL 1056447, at *9 (N.D. Tex. Mar. 18, 2021) (citing DOL Wage and Hour Division Opinion Letter FLSA 2007-2, 2007 WL 506575, at *3 (Jan. 25, 2007) (FLSA 2007-2)).[17] The DOL's 2007 opinion letter concerned salespersons like Plaintiffs whose primary duty was to sell newly-constructed homes. *See* FLSA 2007-2, 2007 WL 506575, at *1. The salespersons addressed in the opinion letter usually worked out of temporary sales facilities, such as model homes or trailers, located near or in the community where the builder was selling homes. *Id.* The builder/employer maintained a separate, permanent office location from which other day-to-day operations were conducted and to which the sales employees reported. *Id.*

In addressing the "outside" sales requirement, the DOL explained that "[s]o long as a salesman customarily and regularly goes to the site of the property or to prospects as a part of

---

[17] Opinion letters of the DOL are not precedent but may be afforded *Auer* deference or respect under *Skidmore*. *Roton v. Peveto Fin. Grp., LLC*, 649 F. Supp. 3d 300, 314 (N.D. Tex. 2022). *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotations and citations omitted) (Where the rule to be interpreted "is a creature of the Secretary's own regulations," these opinions are controlling unless "plainly erroneous or inconsistent with the regulation."); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[W]hile not controlling upon the courts by reason of their authority, [agency opinions] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

making his sales, this requirement for 'outside' sales work would be met."    DOL Field

Operations Handbook (FOH) § 22e06(c).    According to the governing regulations, "[t]he phrase

'customarily and regularly' means a frequency that must be greater than occasional but which, of

course, may be less than constant."    29 C.F.R. § 541.701.    "Tasks or work performed

'customarily and regularly' includes work normally and recurrently performed every workweek;

it does not include isolated or one-time tasks."    *Id.*    However, "[n]othing in [29 C.F.R. §

541.701] requires that, to meet the definition of 'customarily and regularly,' a task be performed

more than once a week or that a task be performed each and every workweek."    Defining and

Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and

Computer Employees, 69 Fed. Reg. at 22,187 (Apr. 23, 2004).

Based on these regulations, the DOL concluded that the salespersons at issue satisfied the

requirement that they be customarily and regularly engaged away from the employer's place of

business in performing their primary duty of selling newly-constructed homes because the

salespersons generally left the model home or trailer one or two hours a day, one or two times a

week, to engage in the selling or sales-related activities.    FLSA 2007-2, 2007 WL 506575, at *3.

The DOL also emphasized that taking customers to various home sites within the community

was an indispensable component of the employee's sales efforts, which necessarily occurred

away from the model home office.    *Id.*

District courts addressing the "outside" requirement have relied upon this DOL opinion

and looked to "whether the employee performs tasks critical to the sales process away from the

office on a greater than occasional basis."    *See Dixon v. Prospect Mortg., LLC,* 11 F. Supp.3d

605, 610 (E.D. Va. 2014) (citing FLSA 2007–2, 2007 WL 506575, at *4).    "Where some of those

component activities take place at a fixed site and others take place outside of a fixed site, the

employee is properly classified as an outside sales employee if the activities occurring outside of the office are critical to the sales process and occur on a consistent basis." *Id.* (quoting *Wong v. HSBC Mortg. Corp.*, 749 F. Supp. 2d 1009, 1013 (N.D. Cal. 2010)).

Although it is certainly possible (if not likely) that the evidence will show that Plaintiffs spent consistent time on activities outside of NewLeaf's office critical to the sales process, again NewLeaf has not directed the Court to any evidence whatsoever regarding the "outside" requirement of the outside-salesperson exemption. It is also plausible that Plaintiffs could testify at trial that they performed their jobs in a manner that did not involve being customarily or regularly away from the office. *See Lipnicki v. Meritage Homes Corp.*, No. 3:10-CV605, 2014 WL 923524, at *3 (S.D. Tex. Feb. 13, 2014) (denying summary judgment on outside-salesperson exemption where plaintiffs testified that they rarely showed inventory homes to prospective buyers and only used model homes sales office as her "sales tool"); *see also Krohn v. David Powers Homes, Inc.*, 2009 WL 1883989, at *6 (S.D. Tex. June 30, 2009) (making factual finding after bench trial that plaintiff was not exempt outside salesperson because, although she had "job responsibilities that generally should require the employee to be customarily and regularly outside the office," she "performed her job in a manner that did not involve her being customarily and regularly away from the office").

Again, NewLeaf bears the burden to establish the application of the outside-salesperson exemption, which requires it to identify evidence in the summary-judgment record on both components of the exemption. As it failed to do so, the Court should not award it summary judgment on its affirmative defense.

### V. Conclusion and Recommendation

Having considered the motions, consolidated response, and consolidated reply, the summary-judgment record, and the governing law, the undersigned **RECOMMENDS** that NewLeaf's motions for summary judgment (New Leaf Homes LLC's Motion for Summary Judgment [#65] in Civil Action No. 5:23-cv-00292-XR; Defendant New Leaf Homes LLC's Motion for Summary Judgment [#51] in Civil Action No. 5:23-cv-00293-XR; and Defendant New Leaf Homes LLC's Motion for Summary Judgment [#42] in Civil Action No. 5:23-cv-00477-XR) be **DENIED** as to Plaintiffs' claims of breach of contract and violations of the FLSA.

It is further **RECOMMENDED** that Plaintiffs' motions for partial summary judgment (Plaintiff's Motion for Partial Summary Judgment [#74] in Civil Action No. 5:23-cv-00292-XR; Plaintiff's Motion for Partial Summary Judgment [#53] in Civil Action No. 5:23-cv-00293-XR; and Plaintiff's Motion for Partial Summary Judgment [#44]) as to their breach-of-contract claims against NewLeaf be **DENIED**.

In light of Plaintiff's failure to address their claims of quantum meruit, promissory estoppel, unjust enrichment, fraud, money had and received, theft of services, willful filing of fraudulent tax forms in violation of 26 U.S.C. § 7434, violation of the Texas Payday Law, and request for an accounting in their summary-judgment response, **IT IS ALSO ORDERED** that Plaintiffs clarify whether they intend to abandon these claims by filing a separate advisory with the Court within the deadline for filing objections to this report and recommendation.

If the District Court adopts the undersigned's recommendation, NewLeaf's motions for summary judgment should still not be terminated in full, as Plaintiffs' individual discrimination claims will be addressed in a subsequent report and recommendation.  Additionally, Navarro's

motion for partial summary judgment should not be terminated in full, as her breach-of-contract claim against Center Point will be addressed in a subsequent report and recommendation along with Center Point's motion for summary judgment. The only motions that should be terminated if this report and recommendation is adopted are Rhoder's and Brown's motions for partial summary judgment.

### VI.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The party shall file the objections with the Clerk of Court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415,

1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §

636(b)(1).

      SIGNED this 3rd day of September, 2025.

                                  ELIZABETH S. ("BETSY") CHESTNEY
                                  UNITED STATES MAGISTRATE JUDGE