IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARIA NAVARRO, | § § § | |
| *Plaintiff,* | § § | SA-23-CV-00292-XR |
| vs. | § § § | |
| NEW LEAF HOMES, LLC,  CENTER POINT REALTY COMPANY, FRED GHAVIDEL, | § § § § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| HOWARD RHODER | § § | |
| *Plaintiff,* | § § | SA-23-CV-00293-XR |
| vs. | § § § | |
| NEW LEAF HOMES, LLC,  FRED GHAVIDEL, | § § § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| DONALD BROWN, | § § | |
| *Plaintiff,* | § § | SA-23-CV-00477-XR |
| vs. | § § § | |
| NEW LEAF HOMES, LLC,  FRED GHAVIDEL, | § § § § | |
| *Defendants.* | § § | |

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS OF DISCRIMINATION**

**To the Honorable United States District Judge Xavier Rodriguez:**

1

This Report and Recommendation concerns the following motions for summary judgment filed by Defendants: Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#65] in Civil Action No. 5:23-cv-00292-XR; Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#51] in Civil Action No. 5:23-cv-00293-XR; Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#42] in Civil Action No. 5:23-cv-00477-XR; Defendant Fred Ghavidel's Motion for Summary Judgment [#62] in Civil Action No. 5:23-cv-00292-XR; Defendant Fred Ghavidel's Motion for Summary Judgment [#48] in Civil Action No. 5:23-cv-00293-XR; Defendant Fred Ghavidel's Motion for Summary Judgment [#40] in Civil Action No. 5:23-cv-00477-XR; and Defendant Center Point Realty's Motion for Summary Judgment [#67] in Civil Action No. 5:23-cv-00292-XR.  All pretrial matters in the consolidated cases have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C.  The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.  Background

Plaintiffs Maria Navarro, Howard Rhoder, and Donald Brown each filed a separate cause of action in state court against their former employer, Defendant NewLeaf Homes, LLC ("NewLeaf"), a builder and residential community developer, and its owner, Fred Ghavidel. Navarro's suit also names a third defendant, Center Point Realty Company ("Center Point"). Center Point is a real estate company founded and managed by Ghavidel.  All three Plaintiffs were sales agents assigned to sell, monitor, and service new home sales in an assigned NewLeaf community subdivision.  All three Plaintiffs contend that Defendants misclassified them as independent contractors, failed to pay them earned commissions, and discriminated against them based on various protected characteristics.  The claims asserted in the three lawsuits are breach

of contract, violations of the Fair Labor Standards Act ("FLSA"), and discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and Chapter 21 of the Texas Labor Code.[1]

The District Court consolidated the three cases on August 9, 2024, and the undersigned issued a formal order of consolidation on April 7, 2025. The parties filed numerous summary-judgment motions on the various claims at issue. The undersigned issued a report and recommendation on Defendant NewLeaf Homes' motions for summary judgment on Plaintiffs' breach-of-contract and FLSA claims, which also addressed Plaintiffs' motions for partial summary judgment on their breach-of-contract claim against NewLeaf. (*See* R&R [#86].) The District Court adopted the report and recommendation and denied the motions as to Plaintiffs' contractual and FLSA claims against NewLeaf. (*See* Order [#89].) Thereafter, the undersigned ordered consolidated briefing as to the remaining motions for summary judgment filed by Plaintiff Navarro and the three Defendants. The undersigned issued a second report and recommendation [#93] on March 13, 2026, which addressed Plaintiffs' FLSA and breach-of-contract claims against Ghavidel and Center Point. In that recommendation, the undersigned recommended that the District Court grant Center Point summary judgment on Navarro's breach-of-contract claim; grant Ghavidel summary judgment on all three Plaintiffs' breach-of-contract claims; and deny Ghavidel's motion for summary judgment as to Plaintiffs' FLSA claims. That recommendation is currently pending before the District Court.

**This third (and final) report and recommendation addresses the remaining issues that need to be resolved in Defendants' pending motions for summary judgment—**

---

[1] Plaintiffs abandoned their previously-asserted claims for quantum meruit, promissory estoppel, unjust enrichment, fraud, money had and received, theft of services, willful filing of fraudulent tax forms in violation of 26 U.S.C. § 7434, and violation of the Texas Payday Law. (*See* Advisory [#87].)

**Defendants' request for summary judgment on Plaintiffs' claims of discrimination and a hostile work environment arising under Section 1981, Title VII, the ADEA, and the Texas Labor Code**.

Navarro, a Hispanic female, alleges that she was the victim of race and national-origin discrimination and a hostile work environment while working for Defendants and asserts a claim under Section 1981 against NewLeaf and Ghavidel and a claim under Title VII and the Texas Labor Code against NewLeaf, Ghavidel, and Center Point.  (Orig. Pet. [#1-2], at ¶¶ 229–67.) Rhoder, an African-American male, alleges that he was the victim of race and sex discrimination and a hostile work environment and asserts claims under Section 1981, Title VII, the Texas Labor Code against NewLeaf and Ghavidel.[2]  (Am. Pet. [#1-2],[3] at ¶¶ 191–241.)  Brown, also an African-American male, alleges that he was the victim of race, sex, and age discrimination and a hostile work environment and asserts claims under Section 1981, Title VII, the ADEA, and the Texas Labor Code against NewLeaf and Ghavidel.  (Orig. Pet. [#1-2],[4] at ¶¶ 210–66.)

Navarro filed her ordered consolidated response in the '292 case [#91], to which Defendants filed a consolidated reply [#92].  Rhoder filed his ordered consolidated response in the '293 case [#58], to which Defendants filed a consolidated reply [#60].  Brown filed his ordered consolidated response in the '477 case [#49], to which Defendants filed a consolidated reply [#50].

---

[2] Rhoder references the ADEA in his pleading by name (*see* Orig. Pet. [#1-2] in the '293 case, at 67), but this appears to be a drafting error, as his allegations of discrimination do not concern age, only his race and sex.

[3] Rhoder's pleading is found in the '293 case.

[4] Brown's pleading is found in the '477 case.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary-judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."  *Westphal*, 230 F.3d at 174.

5

### III.  Summary Judgment Record

NewLeaf is a homebuilder, residential community builder, and land developer that constructs and sells new houses within its residential communities and subdivisions.  (Orig. Pet. [#1-2], at ¶ 19; Answer [#14], at ¶ 19.)  Fred Ghavidel is the owner, president, and manager of NewLeaf.  (Orig. Pet. [#1-2], at ¶ 93; Answer [#14], at ¶ 93.)  Center Point is a real estate company founded and managed by Ghavidel.  All three Plaintiffs worked as sales agents for NewLeaf for a period of years until March and April 2021, when they were laid off.  (Orig. Pet. [#1-2], at ¶ 21; Answer [#14], at ¶ 21; Rhoder Decl. [#53-17],[5] at ¶ 2; Brown Decl. [#44-17],[6] at ¶ 2.)  After Plaintiffs were laid off, they each received severance payments.  (Navarro Checks [#65-11], at 6–8; Rhoder Checks [#81-5], at 5–7; Brown Checks [#81-5], at 9–12.)  NewLeaf takes the position that the reason for the layoffs was a change in the market from the COVID-19 pandemic and a need for a reduction in force.  (NewLeaf Corp. Rep. Dep. [#65-8], at 150:6–151:3.)

As noted in the previous reports and recommendations, all three Plaintiffs signed an Independent Contractor Agreement with NewLeaf in late 2016 or early 2017.  (Navarro NewLeaf IC Agreement [#65-1], at 1–5; Rhoder NewLeaf IC Agreement [#81-2], at 7–11; Brown NewLeaf IC Agreement [#81-2], at 13–17.)  Navarro and Rhoder also signed an Independent Contractor Agreement with Center Point Realty in April 2017.  (Ghavidel Dep. [#65-7], at 10:15–21, 29:3–9; NewLeaf Corp. Rep. Dep. [#65-8], at 52:21–25; Ghavidel Dep. [#65-9], at 50:3–10.)  The Center Point Independent Contractor Agreement requires all licensed real estate agents working for NewLeaf to have their license with Center Point Realty.  (Navarro

---

[5] Rhoder's declaration is found in the '293 case.

[6] Brown's declaration is found in the '477 case.

Center Point IC Agreement [#65-2], at 1–2; Rhoder Center Point IC Agreement [#79-2], at 3–4.) Brown did not have a real estate license, and therefore did not sign an agreement with Center Point. (Brown Dep. [#65-4], at 43:16–44:16.)

As brokers with Center Point, Navarro and Rhoder could sell homes outside of NewLeaf developments and subdivisions. (Navarro Dep. [#65-5], at 7:25–13; NewLeaf Corp. Rep. Dep. [#65-8], at 73:4–76:18.) Plaintiffs' supervisor in both roles was Ghavidel, but the two companies were separate and distinct entities. (Navarro Dep. [#65-5], at 7:25–13; NewLeaf Corp. Rep. Dep. [#65-8], at 52:21–53:2, 116:16–20.) According to Ghavidel, when there was a NewLeaf sale, NewLeaf would pay Center Point and then Center Point would distribute the funds, including commissions. (Ghavidel Dep. [#65-10], at 70:5–13.). It is undisputed that there are a significant number of real estate transactions for which Plaintiffs never received commissions because the transaction closed after their termination. Plaintiffs also assert that there are properties for which they were paid a commission but the commission was underpaid. (Rhoder Underpaid Commissions [#53-2],[7] at 1; Brown Underpaid Commissions [#44-18],[8] at 1–4; Navarro Underpaid Commissions [#74-2], at 1.)

Plaintiffs contend that throughout their employment they were subject to workplace discrimination and that discrimination was the true reason for their termination, as well as the reason for Defendants' failure to pay them commissions. Plaintiffs all filed timely charges of discrimination and were issued notices of their right to sue on January 16, 2023. (Navarro Charge [#1-2], at 48–49; Navarro Right to Sue [#1-2], at 53–54; Rhoder Charge [#1-2], at 75–76;

---

[7] This exhibit is found in the '293 case.

[8] This exhibit is found in the '477 case.

7

Rhoder Right to Sue [#1-2], at 80–81; Brown Charge [#1-2], at 55–56; Brown Right to Sue [#1-2], at 59–60.)[9]

Plaintiffs assert that when they were terminated the only sales agents who kept their positions were white—three white females (Jeanine Turney, Beverly Moretta, Tina Nielson) and one white male (Zale Fletcher). But Plaintiffs have not directed the Court to evidence confirming the race of these retained employees. However, Ghavidel's testimony on behalf of NewLeaf indicates that Defendants agree Nielson is white. (NewLeaf Dep. [#84-13], at 155:6–25.) NewLeaf does not dispute that Moretta and Fletcher are white, but Ghavidel testified that Turney is Hispanic. (Ghavidel Dep. [#93-1], at 94:1–5.) Defendants also point to evidence of an additional retained employee, Mario Morin, who is a sales manager to whom Plaintiffs reported and who (according to Ghavidel in his deposition) is also Hispanic. (Ghavidel Dep. [#79-4], at 54:4–9.) Ghavidel also testified that he himself has some "Hispanic descent." (*Id.* at 60:10–11.)

In addition to Plaintiffs, two other agents were terminated at the same time: Jeff and Ron Belshaw, a father-son team who Navarro characterized as "Korean-ish" in her deposition. (Navarro Dep. [#65-5], at 54:7–55:25.) Yet Ghavidel described the Belshaws as "White, Anglo" in his testimony. (NewLeaf Dep. [#84-13], at 154:10–24.) When asked at his deposition, Brown was unsure of the Belshaws' ethnicity and posited that they might be German. (Brown Dep. [#79-12], at 116:14–18.)

As to commission payments, there is evidence that at least some of Plaintiffs' white counterparts were paid commissions after those counterparts terminated their employment relationship with Defendants. (Ghavidel Dep. [#62-10], at 84:17–85:16; Ghavidel Dep. [#84-

---

[9] Rhoder's exhibits can be found in the '293 case; Brown's exhibits are in the '477 case.

16], at 133:9–134:8; Ghavidel Dep. [#42-7],[10] at 86:11–12, 98:2–24.)    There is also some evidence that Rhoder was paid the commission on a house that closed after his termination date. (Ghavidel Dep. [#92-1], at 199 (72:18–21), 256 (129:20–130:11).)

## IV. Analysis

Defendants move for summary judgment on the discrimination and hostile-work-environment claims asserted by all three Plaintiffs under Section 1981, the ADEA, Title VII, and the Texas Labor Code.  The motions should be granted.

### i.    Plaintiffs have abandoned their hostile-work-environment claims.

Hostile work environment claims under Title VII, the ADEA, Section 1981, and the Texas Labor Code apply the same basic framework.  *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (Section 1981); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (Title VII); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011) (ADEA); *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 131 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (Texas claims).    To prevail on their claims of a hostile work environment, Plaintiffs must demonstrate that they (1) belong to a protected group; (2) were subjected to unwelcome harassment; (3) the harassment complained of was based a protected class characteristic such as race, sex, national origin, or age (depending on the Plaintiff); (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).    Critically, for harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[10] This exhibit is found in the '477 case.

working environment." *Id.* The alleged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quotation omitted). Further, it is examined under a "totality of the circumstances" test, which considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation omitted).

Defendants argue that none of the Plaintiffs has provided the Court with evidence of sufficiently severe or pervasive conduct from which a factfinder could find actionable harassment. The undersigned agrees. Although all three Plaintiffs reference a hostile work environment in their pleadings, each of their consolidated responses addressing their discrimination claims fails to address a separate hostile-work-environment cause of action. Instead, Plaintiffs focus solely on their terminations and the failure to pay commissions. Plaintiffs have therefore failed to satisfy their summary-judgment burden and have abandoned this claim. *See In Re Matter of Dall. Roadster, Ltd.*, 846 F.3d 112, 125–26 (5th Cir. 2017) (holding the plaintiff "abandoned the claim by failing to include any argument about the claim in his response to [the defendant's] motions to dismiss and for summary judgment"); *see also Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (quotation omitted). Accordingly, Defendants are entitled to summary judgment on all three Plaintiffs' claims of a hostile work environment under Section 1981, Title VII, the ADEA, and/or the Texas Labor Code.

10

###### ii.    **Brown has abandoned his ADEA claim.**

Brown has pleaded that he was discriminated against based on his age because he is 54 years old, was qualified for his job, and was discharged, whereas other similarly situated younger individuals were not terminated. (Orig. Pet. [#1-2],[11] at ¶¶ 255–257.)  In his summary-judgment response, however, Brown does not address this age-discrimination claim or respond to Defendants' argument that it should be granted summary judgment on this claim.  Brown has therefore also failed to satisfy his summary-judgment burden to identify evidence in the record that would raise a fact issue regarding allegations of age discrimination, and this claim has also been abandoned.  *See In Re Matter of Dall. Roadster, Ltd.*, 846 F.3d at 125–26.  NewLeaf and Ghavidel[12] are therefore entitled to summary judgment on this claim.

###### iii.    **Rhoder and Brown have abandoned their sex-discrimination claims.**

Rhoder and Brown allege they were the victims of sex discrimination in their pleadings, but they do not defend these claims in their response to Defendants' summary-judgment motions either.  Nor could they plausibly sustain such a claim, as Navarro, a female, was also terminated.  Because Rhoder and Brown failed to satisfy their summary-judgment burden as to their sex-discrimination claims, they have abandoned the claims and Defendants NewLeaf and Ghavidel[13] are also entitled to summary judgment.  *See id.*

---

[11] This document is found in the '477 case.

[12] Center Point is not a Defendant in Brown's suit.

[13] Again, Center Point is not a Defendant in Rhoder's or Brown's suit.

### iv.    **Ghavidel is not a proper Defendant as to Plaintiffs' claims under Title VII and the Texas Labor Code.**

Ghavidel asks the Court to grant him summary judgment as to all three Plaintiffs' discrimination claims under Title VII and the Texas Labor Code on the basis that he cannot be held liable as an individual under either statute. The undersigned agrees.

The Fifth Circuit has long held that there is no individual liability under Title VII. Title VII prohibits discrimination by an "employer." 42 U.S.C. § 2000e-2. And Title VII defines "employer" (subject to exceptions not applicable here) as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C.A. § 2000e. "While Title VII defines the term employer to include 'any agent of an employer,'" the Fifth Circuit does not construe Title VII as "imposing individual liability for such a claim." *Indest v. Freeman Decorating, In*c., 164 F.3d 258, 262 (5th Cir. 1999). Texas courts have similarly found individuals are not liable under the Labor Code. *See City of Austin v. Gifford*, 824 S.W.2d 735, 742 (Tex. 1992) (addressing predecessor statute now codified in Chapter 21 of the Texas Labor Code). Ghavidel is therefore entitled to summary judgment on Plaintiffs' Title VII and state-law discrimination claims asserted against him as an individual.[14]

### v.    **Defendants have not proved Plaintiffs were independent contractors as a matter of law to preclude Plaintiffs' race discrimination claims under Title VII and Texas law.**

NewLeaf and Center Point argue they are entitled to summary judgment on Plaintiffs' Title VII and state-law discrimination claims because Plaintiffs were not their employees but

---

[14] Ghavidel did not seek summary judgment on this basis as to Plaintiffs' Section 1981 claims. Individual liability is available under Section 1981 where the individual is a supervisor personally involved in the discriminatory activity and is "essentially the same" as the employer in exercising authority over the plaintiff. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 337 (5th Cir. 2003).

12

rather independent contractors.  Title VII and Chapter 21 of the Texas Labor Code prohibit an employer from discriminating against an employee based on race, color, and national origin.[15] 42 U.S.C. § 2000e–2; Tex. Lab. Code § 21.051.  To determine whether a person is an employee versus an independent contractor, the controlling standard in both the Fifth Circuit and Texas courts is the hybrid "economic realities/common law control test."  *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013); *see also Magallanes v. Penske Logistics, LLC*, 570 F. Supp. 2d 907, 912 (W.D. Tex. 2008) (citing *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 263–64 (Tex. App.—Fort Worth 2003, pet. denied)).

The economic-realities portion of the test asks whether a putative employee, as a matter of economic reality, is dependent upon the business to which he renders service or is in business for himself.  *Juino*, 717 F.3d at 434.  This includes whether the worker's opportunity for profit or loss is determined by the alleged employer and whether the worker worked exclusively for the alleged employer, as well as "whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."  *Muhammad v. Dallas Cnty. Cmty. Supervision & Corrs.*, 479 F.3d 377, 380 (5th Cir. 2007) (quotation omitted).

The common-law control portion of the test, which courts are instructed to emphasize over the economic-realities portion, assesses "the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed."  *Juino*, 717 F.3d at 434 (quotation omitted).  When examining the control component, courts have focused on whether the alleged employer has the right to hire, fire, supervise, and set the work

---

[15] Section 1981, in contrast, applies more broadly to prohibit discrimination in the "making, performance, modification, and termination of [all] contracts" and therefore does not turn on whether an individual is an employee or independent contractor.  *See* 42 U.S.C. § 1981(b).

schedule of the employee. *Muhammad*, 479 F.3d at 380. The Fifth Circuit has stated that the following factors are also pertinent to the analysis:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Juino*, 717 F.3d at 434–35 (quotation omitted). The "hybrid economic realities/common law control test" "is necessarily a fact-specific inquiry." *Muhammad*, 479 F.3d at 382.

Viewing the facts in the light most favorable to Plaintiffs, Defendants have not established that Plaintiffs were independent contractors as a matter of law. First, the evidence favors Plaintiffs' position that they were employees when viewed under the economic-realities portion of the test. Navarro testified that she worked exclusively for Defendants on a full-time basis for years (from September 2016 when she signed the NewLeaf Agreement to early 2021) and did not have any time to work for anyone else. (Navarro NewLeaf Agreement [#65-1], at 5; Navarro Dep. [#65-5], at 17–7.) Rhoder executed the NewLeaf Agreement in January 2017; Brown executed his agreement in September 2016; both were also terminated in early 2021. (Rhoder NewLeaf Agreement [#51-1],[16] at 5; Brown NewLeaf Agreement [#42-1],[17] at 5.) The NewLeaf agreement contemplated Plaintiffs' exclusively performing work for Defendants, as it contained a non-solicitation provision, prohibiting Plaintiffs from engaging in outside sales

---

[16] This exhibit is found in the '293 case.

[17] This exhibit is found in the '477 case.

involving competing homes during their employment as well as a period of one year following termination.  (Navarro NewLeaf Agreement [#65-1], at 3.)  Plaintiffs' entire income depended upon the commission structure established under the parties' contracts, and their opportunity for profit and loss (though in part based on their diligence in securing sales) also directly hinged upon Defendants' payment of earned commissions.

The control portion of the test does not decisively favor Defendants' position that Plaintiffs were independent contractors either.  As already noted, Plaintiffs worked exclusively for Defendants for years.  They were subject to termination at the whim of Defendants without notice.  Although the parties' agreements are titled "Independent Contractor" agreements (and Plaintiffs were issued Form 1099s not W-2s), the NewLeaf Agreement repeatedly references Plaintiffs' "employment" and categorizes Plaintiffs as "at will employees."  (Navarro NewLeaf Agreement [#65-1], at 1; Rhoder Dep. [#79-10], at 63:20–25.)  The severance agreement that NewLeaf issued to each Plaintiff also specifically references an "employer-employee relationship" and refers to Plaintiffs as employees throughout the agreement.  (Navarro Severance Agreement [#65-11], at 2.)

There were also no particular skills required to work as a sales agent for NewLeaf; not even a real estate license was required.  (Navarro Dep. [#65-5], at 92:9–16.)  Defendants also exerted significant control over Plaintiffs' work schedules and how they completed their work tasks, and their work as sales agents was fundamental to Defendants' business model.  The NewLeaf Agreement required Plaintiffs to ensure that their model homes were open from 12 p.m. to 6 p.m. seven days a week and that the homes were covered by sales agents at all times. (NewLeaf Agreement [#65-1], at 1.)  Additionally, all agents were required to actively market their assigned community two hours per workday.  (*Id.* at 2.)  Plaintiffs were prohibited from

15

assigning these responsibilities to others without written authorization from NewLeaf. (*Id.*) The NewLeaf agreement also provides authority for NewLeaf to "enact and enforce specific guidelines or priorities with regard to the duties and responsibilities of Salesperson in his or her sales community" and requires that such guidelines be followed. (*Id.* at 1.) Although no one expressly directed Navarro how to make her sales, she was not free to structure her own workday or workweek without oversight by Defendants. (Navarro Dep. [#65-5], at 86:12–14.)

As to the equipment and benefits provided to Plaintiffs, the evidence is unclear and could cut both ways. Although the Center Point Agreement provides that agents were required to pay their own realtor and MLS dues, late fees incurred for MLS violations, and for all lock boxes and real estate materials, Navarro testified that in reality Ghavidel "paid for everything" for Plaintiffs—from real estate license dues to continuing education. (*Id.* at 30:5–31:4, 63:10–20.) The contract also specifies that Defendants provided Plaintiffs with their first two realtor signs and their first box of business cards. (NewLeaf Agreement [#65-1], at 1.) There is no evidence, however, that Defendants provided Plaintiffs with traditional benefits—retirement, health, or otherwise.

In sum, while some evidence points in the direction of finding Plaintiffs to be independent contractors, neither NewLeaf nor Center Point has established Plaintiffs' contractor status as a matter of law under the fact-intensive economic-realities and control tests that apply to determine whether Plaintiffs may sue under Title VII or its Texas analog. Instead, a reasonable fact finder could find that Plaintiffs are, in fact, employees. Accordingly, Defendants are not entitled to summary judgment on the basis that Plaintiffs were not employees for purposes of Title VII and Chapter 21 of the Texas Labor Code.

16

### vi.    Nonetheless, Defendants are entitled to summary judgment on Plaintiffs' claims of race and national origin discrimination.

Finally, Defendants are also entitled to summary judgment on Plaintiffs' claims of race/national origin discrimination under Title VII and the Texas Labor Code (as to NewLeaf and Center Point) and under Section 1981 (as to all three Defendants). Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 guarantees all persons in the United States the "same right . . . to make and enforce contracts" and "the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). And the Texas Labor Code forbids employment discrimination "because of race, color, . . . [or] national origin." Tex. Lab. Code § 21.051. Discrimination claims "under Title VII, the Texas Labor Code, and Section 1981 are generally analyzed under the same Title VII framework." *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 87 (5th Cir. 2019) (per curiam) (citing *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (Title VII and 42 U.S.C. § 1981); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (Texas Labor Code)).

Navarro, Rhoder, and Brown allege that the true reason for their termination and the failure of Defendants to pay them earned commissions was race discrimination. A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016). Where a plaintiff offers only circumstantial evidence of discrimination, as here, the *McDonnell Douglas* framework requires her to establish a prima facie case of discrimination, which, only if established, raises a presumption of discrimination. *See Rutherford v. Harris Cnty., Tex.*, 197 F.3d 173, 179–80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). To

17

establish a prima facie case of discrimination, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated or that she was replaced by someone outside her protected class. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).

If established, a plaintiff's *prima facie* case creates an inference of discrimination that shifts the burden of production to the defendant to come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Rutherford*, 197 F.3d at 180. This burden is one of production, not persuasion, and can involve no assessment of credibility. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Once the employer articulates a legitimate nondiscriminatory reason and produces competent summary-judgment evidence in support of that stated reason, the inference of discrimination disappears, and the burden shifts back to the plaintiff to produce evidence that demonstrates the employer's articulated reason for the adverse employment action was merely a pretext for discrimination. *Rutherford*, 197 F.3d at 180.

Title VII and the Texas Labor Code allow for a mixed-motive framework of causation for discrimination (as opposed to retaliation) claims. *Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 525 (5th Cir. 2025); *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (2015) (quoting *Reeves*, 530 U.S. at 143). Although the Fifth Circuit has not addressed whether mixed-motive causation is available for claims arising under Section 1981, numerous district courts in this Circuit have applied Title VII's governing standards to such claims and allowed for a plaintiff to show that the protected characteristic was a "motivating factor" for the alleged discrimination. *See, e.g.*, *Washington v. Nat'l Oilwell Varco, L.P.*, 634 F. Supp. 3d 316, 322

18

(N.D. Tex. 2022).  Under a mixed-motive analysis, a plaintiff "must offer sufficient evidence to create a genuine issue of material fact that the defendant's reason, while true, is only one of the reasons for its conduct and that another motivating factor was the plaintiff's protected characteristic." *Stelly*, 149 F.4th at 525.

Plaintiffs have satisfied their initial burden to establish a *prima facie* case of race/national origin discrimination.  It is undisputed that (1) Navarro is Hispanic and Rhoder and Brown are African American, making them members of a protected group; (2) Defendants do not dispute that Plaintiffs were qualified for their positions (though Defendants do assert that Plaintiffs had performance issues); (3) Plaintiffs were terminated and did not receive all unpaid commissions; and (4) Defendants did not withhold the commissions of other similarly situated agents outside of Plaintiffs' protected groups.  NewLeaf testified through its corporate representative (Ghavidel) that Defendants had discretion to pay or not pay commissions at the time of termination. (NewLeaf Dep. [#84-13], at 119:22–24; *see also* Ghavidel Dep. [#84-16], at 174:2–20.) Ghavidel testified in his personal depositions that there have been instances in which agents were paid commissions after termination.  (Ghavidel Dep. [#62-10], at 84:17–85:16, 90:15–91:7; Ghavidel Dep. [#84-16], at 133:9–134:8; Ghavidel Dep. [#42-7],[18] at 98:2–24.)  According to Ghavidel, these individuals asked if they could stay on to earn a specific commission, and NewLeaf agreed to "take care of the customer" through closing.  (Ghavidel Dep. [#42-7], at 98:25–99:14.)

The fourth element requires Plaintiffs to identify at least one coworker outside of his protected class who was treated more favorably "under nearly identical circumstances." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kansas City*

---

[18] This exhibit is found in the '477 case.

*S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)).  Plaintiffs have done so by identifying Svetlana ("Lana" Marinin), a white agent, who held the same position as Plaintiffs, left employment with Defendants with multiple sales pending, and yet still received her commissions upon separation of employment.  (Ghavidel Dep. [#62-10], at 84:17–85:16; Ghavidel Dep. [#84-16], at 133:9–134:8; Ghavidel Dep. [#42-7],[19] at 86:11–12, 98:2–24.)  Although Marinin voluntarily separated employment and was not terminated like Plaintiffs, Ghavidel testified that had Brown left on his own terms instead of being discharged, he still "probably" would not have been paid outstanding commissions and that the distinction between quitting and termination was immaterial to the discretionary decision to withhold or pay commissions to departing employees.  (Ghavidel Dep. [#84-16], at 142:22–143:14.)  Additionally, there is evidence that other white agents, such as Tina Nielson (who took over Navarro's properties) received commissions (or a portion thereof) without completing all the alleged requirements to earn a commission set forth in the NewLeaf Agreement.  (Ghavidel Dep. [#84-14], at 179:21–180:7, 182:16–24, 183:16–24; Ghavidel Dep. [#84-15], at 188:22–189:1.)  Plaintiffs have met their summary-judgment burden to establish a *prima facie* case of discrimination based on the withholding of commissions upon their termination.

The race-based evidence regarding Plaintiffs' terminations themselves, however, is less clear.  As noted, Plaintiffs have not directed the Court to evidence confirming the race of those agents retained at the time of their termination, and the parties do not agree as to the race of all these individuals.  But Plaintiffs have identified at least one retained sales agent, Jeanine Turney, who they agree is white.  Whether Plaintiffs have satisfied their *prima facie* case of

---

[19] This exhibit is found in the '477 case.

discrimination as to their termination allegations is a closer call. In the end, however, it is immaterial for the reasons that follow.

Defendants, in turn, have met their burden of production to identify a legitimate, nondiscriminatory basis for Plaintiffs' termination: economic circumstances and sales performance of agents. NewLeaf testified that the reason for the termination of Plaintiffs was a change in the market post COVID-19. (NewLeaf Dep. [#65-8], at 150:6–19.) Defendants also point to evidence that Plaintiffs had various performance issues justifying their selection or termination once Defendants decided to downsize their sales force. (*Id.* at 149:13–24.) Defendants have also produced a reason for their withholding of commissions that is not race-based: other agents requested payment of a specific commission and the exception was granted. (Ghavidel Dep. [#42-7], at 98:25–99:14.)

Plaintiffs therefore bear the ultimate burden of demonstrating that these articulated bases for their termination and the withholding of commissions were pretextual or that another motivating factor was their race or national origin. As to their termination, Plaintiffs have not directed the Court to any evidence that could support an inference that their termination was based on their race or national origin aside from the fact that the other terminated agents were also possibly Korean (or Anglo or German) and that white agents were retained. (Navarro Dep. [#65-5], at 54:7–55:25; NewLeaf Dep. [#84-13], at 154:10–24; Brown Dep. [#79-12], at 116:14–18.) Yet there is also evidence that Ghavidel himself is part Hispanic; that Morin, Plaintiffs' manager, was also Hispanic; and that one of the retained agents (Jeanine Turney) was also Hispanic. (Ghavidel Dep. [#79-4], at 54:4–9; Ghavidel Dep. [#93-1], at 94:1–5.)

As to the withholding of commissions, the only evidence that speaks to Plaintiffs' race is that Defendants chose to pay some white agents commissions after their separation of

employment.  Yet there is also evidence that Brown might have been paid commissions after his termination as to some properties for which he facilitated the sale.  (Ghavidel Dep. [#92-1], at 199 (72:18–21), 256 (129:20–130:11).)  Based on this evidence alone, no reasonable juror could conclude that the reason for Plaintiffs' termination or the withholding of their commissions was due to their race or national origin.

Yet Plaintiffs also argue that there is evidence undermining the credibility of Defendants' stated reason for their termination.  "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024) (quotation omitted).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  This can be demonstrated by evidence that the employer provided inconsistent explanations for termination over time or that the reasons given are factually erroneous.  *Caldwell v. KHOU-TV*, 850 F.3d 237, 242–44, 246 (5th Cir. 2017).

First, as to Defendants' assertion that their reduction in force was economically motivated, Plaintiffs argue they have provided contradictory evidence that the housing market in the San Antonio area saw double-digit growth in March to April 2021 (around the time when Plaintiffs were terminated) and NewLeaf's public facing website continued to tout exceptionally high demand throughout April 2021.  (EEOC Resp. [#91-5], at 2; MLS Data [#91-5], at 10–15.)  But there is no evidence of the website itself in the record, only a statement about it by Plaintiffs themselves in their EEOC filing. (EEOC Resp. [#91-5], at 2.) Second, as to the assertions regarding performance issues, Plaintiffs claim that they were valued as longstanding team members and direct the Court to testimony by Ghavidel that Navarro was a "great employee"

and a "great salesperson." (Ghavidel Dep. [#84-14], at 153:16–25.)  Yet elsewhere he described Navarro as having issues with customers; not returning phone calls; requiring a lot of "hand holding"; and as being the target of several customer complaints (at least one of which was communicated in writing and is in the record).  (NewLeaf Dep. [#65-8], at 149:13–24; Ghavidel Dep. [#92-1], at 452–53; *see also* E-Mail Communication [#92-1], at 1279.)  Ghavidel also testified that Rhoder at times would become "stagnant" with sales, necessitating conversations regarding his improvement, and that Brown was not very "computer savvy"; completed all contracts by hand; and had not obtained his realtor's license despite Ghavidel encouraging him to do so for years.  (Ghavidel Dep. [#92-1], at 457 (80:1–17), 703–04 (160:10–161:22).)  Ghavidel did concede, however, that there were never any written complaints regarding Plaintiffs' work performance (noting they were not that formal as a company).  (*Id.* at 153:25–154:8, 196:15–21)).

Second, Plaintiffs emphasize that Defendants' stated reason for their termination shifted over time, impairing their credibility and giving rise to an inference of pretext.  Initially, Plaintiffs were not provided any reason for their termination.  (Navarro Dep. [#79-7], at 48:1–7.)  According to Navarro, she was simply told by her supervisor, Morin, that "there's no friends" in business and was let go without notice.  (*Id.*)  Once Plaintiffs filed their charges of discrimination, Defendants for the first time asserted that the reason for Plaintiffs' termination was "the unforeseen housing market."  (Morin Statement [#91-4], at 2.)  It was not until Defendants' depositions that they asserted Plaintiffs had performance issues.  (*See* NewLeaf Dep. [#84-13], at 149.)

On the aforementioned record, Plaintiffs have not established that a reasonable factfinder could conclude that the true reason (or one reason) for their terminations or the withholding of

commissions was race or national-origin discrimination.  Plaintiffs have not provided the Court with sufficient evidence that Defendants' description of the housing market in 2021 was false. The record contains corroborating evidence that at least some customers had issues with Navarro and that there were objective bases for distinguishing Brown (who did not have a real estate license and worked by hand) from other sales agents.  Finally, no reasonable factfinder would credit Plaintiffs' assertion that Defendants' stated reasons for their termination shifted over time. The record establishes only that no reason was provided to Plaintiffs when they were terminated—not that a particular reason was provided that was later contradicted by Defendants. Finally, Defendants' testimony that they selected those agents with performance issues for termination is easily harmonized with their assertion that those terminations were necessitated by adverse economic circumstances.  In sum, Plaintiffs have not raised a genuine issue of material fact on the issue of pretext, and NewLeaf and Cetner Point are entitled to summary judgment on Plaintiffs' claims of race and national-origin discrimination.

## V.  Conclusion and Recommendation

Having considered the motions, consolidated responses, and consolidated replies, the summary-judgment record, and the governing law, the undersigned **RECOMMENDS** the following:

- Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#65] in Civil Action No. 5:23-cv-00292-XR as to Navarro's claims of a hostile work environment and discrimination be **GRANTED**.

- Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#51] in Civil Action No. 5:23-cv-00293-XR as to Rhoder's claims of a hostile work environment and discrimination be **GRANTED**.

- Defendant NewLeaf Homes LLC's Motion for Summary Judgment [#42] in Civil Action No. 5:23-cv-00477-XR as to Brown's claims of a hostile work environment and discrimination be **GRANTED.**

- Defendant Fred Ghavidel's Motion for Summary Judgment [#62] in Civil Action No. 5:23-cv-00292-XR as to Navarro's claims of a hostile work environment and discrimination be **GRANTED.**

- Defendant Fred Ghavidel's Motion for Summary Judgment [#48] in Civil Action No. 5:23-cv-00293-XR as to Rhoder's claims of a hostile work environment and discrimination be **GRANTED.**

- Defendant Fred Ghavidel's Motion for Summary Judgment [#40] in Civil Action No. 5:23-cv-00477-XR as to Brown's claims of a hostile work environment and discrimination be **GRANTED**.

- Defendant Center Point Realty's Motion for Summary Judgment [#67] in Civil Action No. 5:23-cv-00292-XR as to Navarro's claims of a hostile work environment and discrimination be **GRANTED.**

**If the District Court adopts the this recommendation and the recommendation issued on March 13, 2026 [#93], then the Clerk should terminate all pending motions in all three consolidated cases in full, as all issues raised therein have now been resolved.**

## VI.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party

25

from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

SIGNED this 23rd day of March, 2026.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE